Mark E. Merin (State Bar No. 043849)
Paul H. Masuhara (State Bar No. 289805)
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone:     (916) 443-6911
Facsimile:     (916) 447-8336
E-Mail:        mark@markmerin.com
               paul@markmerin.com

Attorneys for Plaintiffs
PATRICK MAHONEY, CAROLINE
KENNEDY, SURACHA XIONG,
and BRANDON ALLEN, SR.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| PATRICK MAHONEY, et al., | Case No. |
| Plaintiffs, | **DECLARATION OF MARK E. MERIN IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
| vs. | |
| CITY OF SACRAMENTO, et al., | |
| Defendants. | Date:         TBD |
| | Time:         TBD |
| | Location:     Robert T. Matsui U.S. Courthouse |
| | 501 I Street |
| | Sacramento, CA 95814 |
| | Courtroom:    TBD |
| | District Judge:    TBD |

I, Mark E. Merin, do declare and say:

1.      I am an attorney licensed to practice in all of the courts in the State of California and in the United States District Court for the Eastern District of California. My office represents Plaintiffs Patrick Mahoney, Caroline Kennedy, Suracha Xiong, and Brandon Allen, Sr., on behalf of themselves and a class of similarly situation persons.

**NOTICE**

2.      Pursuant to Fed. R. Civ. P. 65(b) and E.D. Cal. L.R. 231(a), my office provided actual

1

notice of the intended filing of this action and this motion for temporary restraining order to counsel for the affected parties, Defendants City of Sacramento and Sacramento Police Department. Notice was provided by informing the affected parties' counsel of the intention to seek a temporary restraining order and the nature of the relief to be requested. I personally called the Sacramento City Attorney's Office and spoke to Beau Parkhurst, an Assistant City Attorney, whom I informed of the intended filing of the papers requesting a temporary restraining order to prevent the removal of a port-a-potty from the vicinity of a homeless encampment.  I attempted to discuss alternatives to the formal request for a temporary restraining order but Mr. Parkhurst informed me that he was not the right person with whom to discuss alternatives, and that I should speak with Mr. Brett Witter, another City Attorney. I left my number, as I had previously done when I called the City Attorney's office earlier this morning.

3.       Before I spoke with Mr. Parkhurst, I had attempted in an earlier call to speak with Mr. Brett Witter, but I was informed he was in a meeting and was not available. Mr. Parkhurst said he would relay the information about the TRO to Mr. Witter.

4.       I personally informed Mr. Parkhurst that it was my office's intention to seek a temporary restraining order against Defendants City of Sacramento and Sacramento Police Department and, once a specific time and location has been set by the Court for a hearing on an temporary restraining order, my office will promptly give additional notice of the time and location of the hearing to the Sacramento City Attorney's Office.

5.       I attempted to discuss alternatives to a TRO hearing with Mr. Parkhurst at the Sacramento City Attorney's Office. Specifically, I was informed he was not in a position to either discuss alternatives or stipulate to a TRO, pending the filing of and hearing on a motion for preliminary injunction.

## FACTS & EXHIBITS

6.       On January 29, 2020, I visited an encampment of approximately 30 unsheltered, homeless persons living in tents on the shoulders of both sides of North B Street, west of North 7th Street, in the City of Sacramento. They described having had no convenient access to restroom facilities and having to walk a mile to the closest commercial establishment with a restroom they could use, until a private citizen arranged for the delivery of a port-a-potty for their use.

7.       Attached hereto as Exhibits A, B, C, and D are declarations from a few of the residents of

2

the homeless community they refer to as "Hopeful Community" describing both how they disposed of their bodily waste before the port-a-potty was delivered, and the distress they have suffered since it was removed nine days after it was placed, even though it was being regularly serviced and maintained in a clean a sanitary fashion.

8.      I am informed that the port-a-potty was replaced on February 3, 2020, and the residents of Hopeful Community fear that it will again be removed by Defendants City of Sacramento and The City's Police Department unless this Court enjoins the removal of the port-a-potty until a hearing on Plaintiffs'' request for a preliminary injunction can be heard.

9.      Homeless residents of Hopeful Community have signed a petition circulated at the encampment supporting the retention of the port-a-potty delivered to their community and asking the Court to enjoin its removal pending a hearing on the community's request for a preliminary injunction against its removal. The petition is attached to this declaration as Exhibit E.

10.     When I visited Hopeful Community I observed that some residents were physically disabled, could not walk without use of walkers or wheelchairs, and could not make it to and back from the closest restroom in a commercial restaurant a mile from the community, resulting in their having to dispose of their bodily waste in the outdoors in an unhealthy and unsanitary fashion.

11.     The City of Sacramento has recognized the skyrocketing number of unsheltered homeless persons in Sacramento and, in order to increase the number of shelters available for homeless persons, has declared a shelter crisis in the City of Sacramento. A copy of that City Council Report and Declaration of a Shelter Crisis is attached as Exhibit F.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed on February 4, 2020, at Sacramento, California.

_____
                    Mark E. Merin

# EXHIBIT A

1    **<u>DECLARATION OF PATRICK R. MAHONEY</u>**

2    I, Patrick R. Mahoney, do declare and say:

3    1.    I am a 60 year old disabled homeless man and I presently reside in a tent on a wide

4    shoulder area on North B Street in the City of Sacramento.

5    2.    I was living in a house with my mother until she died and the house was sold and I was

6    put out on the street.

7    3.    My SSI payment of $800 per month is not adequate for me to rent an apartment or even a

8    room if I am to have any money available for food or other necessities. Therefore, I have been forced to

9    sleep out-of-doors.

10    4.    I have been unable to get into any shelter as they are all either full or I am told I do not

11    qualify for admission.

12    5.    Part of my disability is the loss of feeling in my legs which makes it difficult for me to get

13    around.

14    6.    I have been in the area where I live for the last month; there are about 30 other people

15    living in tents along side of me and on the opposite side of the road. Most of them have been in the area

16    longer than I have.

17    7.    A big problem we all have is where to go to relieve ourselves. The closest place where we

18    might be permitted to use the facilities is at the McDonald's fast food restaurant and that is about a mile

19    away, and, frankly, it is very difficult to make it that far, especially at night or in bad weather and we're

20    having a lot of that now.

21    8.    About two weeks ago, some folks who have been bringing us food and water on occasion,

22    asked the folks in this encampment if we would care for, clean and maintain a port-a-potty if they

23    arranged for one to be sited in our vicinity. We all agreed and welcomed the arrival of a clean, stocked,

24    port-a-potty which we used and maintained.

25    9.    Then suddenly, on Saturday, January 25, after only 9 days, the port-a-potty was removed

26    by the company which delivered it on orders from the City's police department. That has caused us

27    tremendous suffering and we are not in a position to protect the environment from the human waste

28    which, as a result of the removal of the port-a-potty, will now be disposed of in unsanitary ways.

1

10. The port-a-potty is now being replaced by the public spirited citizens who have contracted for its placement with their own donated private funds. Unless the court acts to stop the city from removing it, waste which would have gone into the port-a-potty will now go into the environment and potentially threaten the water supply on which we all depend.

11. Also, because we do not have bathroom facilities available to us, we will have either to hold our urine and bowel movements for unhealthy periods, if we can, while we search for safe places to go, or brave the elements in search of a sanitary place where we can do our business.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed on _____ 2020, at Sacramento, California.

Patrick R. Mahoney

**DECLARATION OF PATRICK R. MAHONEY**

# EXHIBIT B

### DECLARATION OF CAROLINE KENNEDY

I, Caroline Kennedy, do declare and say:

1.     I am a 62 year old woman who has been homeless and lived in a tent on North B Street in Sacramento for about a year.

2.     Until recently the little encampment of about 30 people had no access to bathroom facilities and we had to walk about a mile to get to the closest bathroom where public was permitted.

3.     I would try to put my waste in plastic bags and then dump the urine outside somewhere and put the solid waste in a trash container, if I could find one.  The city has been picking up trash which the folks in this little encampment and I bag and put out for pick-up.

4.     A very nice woman came to us and told us she would arrange to have a port-a-potty brought out here if we would agree to keep it clean and maintain it.

5.     I and the others were happy to do this and for nine days, until about two weeks ago, we had the port-a-potty in our midst and it made all the difference in the world.  No longer did I have to go outdoors or walk a mile to use the bathroom, if I could plan ahead and make it there.

6.     Then the port-a-potty was removed by the company because the police made them take it away.

7.     I understand we are getting it back but I am afraid that without a court order preventing its removal, the police will again make the company take it away and we will have to go back to polluting the environment with our waste that we cannot otherwise dispose of in a healthy and sanitary fashion.

8.     We do not want to foul the environment with our waste, but without a place to stay indoors where there is plumbing or access to a bathroom, homeless people such as myself, have to dispose of our waste as best we can, and often that is just outside and not good for anyone.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed on _1/30/2020_ , 2020, at Sacramento, California.


_Caroline H. Kennedy_
Caroline Kennedy

1

**DECLARATION OF CAROLINE KENNEDY**

# EXHIBIT C

1

## DECLARATION OF SURACHA XIONG

2   I, Suracha Xiong, do declare and say:

3      1.      I am 38 years old and have lived for the last three or four months in a tent on North B

4   street in Sacramento in an encampment of about 30 other homeless persons.

5      2.      Until recently we had no bathroom facilities available to us and I customarily urinated and

6   moved my bowels outdoors wherever I could get a bit of privacy.

7      3.      Then, about three weeks ago, a woman arranged to have a port-a-potty placed near our

8   encampment back from the road and out of the way of traffic. We all agreed that we would take care of

9   the port-a-potty and I looked after it and washed it every day. It was kept clean and used, gratefully, by

10  all in our little community.

11     4.      Then, one day about a week ago, the port-a-potty was removed and we were left to go

12  outdoors as we had in the past, even though we know this is unhygienic and bad for the environment.

13     5.      I understand the port-a-potty is being returned to us but that the city and the police are

14  threatening to order it removed again. I am asking the court to stop the city from removing or ordering

15  the removal of the port-a-potty because we want a dignified way to dispose of our waste. Unless the

16  Court enjoins the city and the police from ordering the removal of the port-a-potty, we and the

17  community at large will suffer and possibly become sick from exposure to pathogens in the waste.

18     I declare under penalty of perjury of the laws of the State of California that the foregoing is true

19  and correct and that this declaration was executed on _Jan  20_ , 2020, at Sacramento, California.

20

21

22  _____

                Suracha Xiong

23

24

25

26

27

28

1

DECLARATION OF SURACHA XIONG

# EXHIBIT D

1

## DECLARATION OF BRANDON EUGENE ALLEN, SR.

2      I, Brandon Eugene Allen, Sr., do declare and say:

3      1.      I am 42 years old and have been living in a tent on North B Street in Sacramento for the

4 last two years.

5      2.      The closest bathroom is at McDonalds on Richards Boulevard or at Denny's across the

6 street from McDonalds.  They are both close to a mile away and I would try to get there when I had to

7 go, but because of the distance and because of the difficulty of getting there at night and in bad weather, I

8 am often required to just go outdoors.

9      3.      I and all of the others in our little homeless community here were thrilled beyond belief

10 when a wonderful, public spirited private citizen, brought us a port-a-potty for us to use and arranged for

11 it to be serviced two or three times a week.

12      4.      I agreed to help maintain it and did that for more than a week until the city police ordered

13 the port-a-potty company to remove it.

14      5.      Now I am left to use the outdoors as my bathroom even though it is embarrassing and I

15 would rather not have to do that.

16      6.      I understand the port-a-potty is being returned to us but I know the city police will direct it

17 be removed unless the court, recognizing that access to bathroom facilities is a human right, prevents the

18 city and its police department from removing the port-a-potty.

19      7.      Please, judge, give us a little dignity.  I know you can't order the city to give us shelter,

20 but at least let private citizens give us a little sense of humanity by allowing the placement and servicing

21 of the port-a-potty.

22      I declare under penalty of perjury of the laws of the State of California that the foregoing is true

23 and correct and that this declaration was executed on ___February 3___, 2020, at Sacramento, California.

24

25

26                    Brandon Eugene Allen, Sr.

27

28

---

DECLARATION OF BRANDON EUGENE ALLEN, SR.

# EXHIBIT E

## PETITION IN SUPPORT OF RETENTION OF THE PORT-A-POTTY ON NORTH B STREET, WEST OF NORTH 7TH STREET TO SERVICE OUR HOMELESS COMMUNITY

The undersigned are all homeless people who have lived for more than a month in our tents on the set backs from both sides of the roadway on North B street, west of North 7th street in Sacramento. Until a private citizen with a huge heart arranged for a port-a-potty to be delivered to a location near us for our use, we had nowhere to go for bathroom facilities, unless we walked about a mile to use bathrooms at McDonalds or Denny's on Richards Boulevard. The port-a-potty was a huge benefit and kept us from despoiling the environment with our bodily fluids, which was what we had to do before the port-a-potty arrived, and what we will now have to do if the port-a-potty is taken away again.

The port-a-potty was taken away on order of the City of Sacramento's police department. It has now been brought back and we need to have the court prevent the city or the police from removing it. We kept it clean while it was here, and we will keep this port-a-potty clean if the Court prevents its removal.

| | |
|---|---|
| X. CLARK, MARK ARTHUR | _(signature)_ |
| KRISHAN PRATM | _(signature)_ |
| DANIEL VILLEGAS | _(signature)_ |
| MaTThew Johnson | Matthew Johnson Jr. |
| Khala Flores-Holmes | _(signature)_ |
| Mary Lor | _(signature)_ |
| Jesse Morales | Jesse Morales |
| William Holmes III | William Holmes III |
| Edward Romero | EDWARD R |
| Michael Brown | Michael Brown |
| | |

PETITION IN SUPOPORT OF RETENTION OF THE PORT-A-POTTY ON NORTH B STREET, WEST OF NORTH 7TH STREET TO SERVICE OUR HOMELESS COMMUNITY

The undersigned are all homeless people who have lived for more than a month in our tents on the set backs from both sides of the roadway on north B street, west of north 7th street in Sacramento.  Until a private citizen with a huge heart arranged for a port-a-potty to be delivered to a location near us for our use, we had nowhere to go for bathroom facilities, unless we walked about a mile to use bathrooms at McDonalds or Denny's on Richards Boulevard.  The port-a-potty was a huge benefit and kept us from despoiling the environment with our bodily fluids, which was what we had to do before the port-a-potty arrived. And what we will now have to do if the port-a-potty is taken away again.


Then it was taken away on order of the City of Sacramento's police department.  It has been brought back and we need to have the court prevent the city or the police from removing it.  We kept it clean while it was here, and we will keep this port-a-potty clean if the Court prevents its removal.

| | |
|---|---|
| _Ross Brandon_ | 02-02-2020 |
| _Jaime Bazan_ | 02-02-2020 |
| _____ | 02.02.2020 |

# EXHIBIT F



# City Council Report

915 I Street, 1st Floor
Sacramento, CA 95814
www.cityofsacramento.org

---

**File ID:** 2019-01835 | January 14, 2020 | **Consent Item 12**

---

**Title:  Declaration of a Shelter Crisis**

**Location:** Citywide

**Recommendation:** Adopt a Resolution: 1) making the findings necessary for declaration of a Shelter Crisis; 2) declaring a Shelter Crisis pursuant to Government Code Section 8698.2; and 3) directing the City Manager to take certain administrative actions to streamline provision of shelter to people experiencing homelessness.

**Contact:** Tom Pace, Interim Director, (916) 808-2691, Community Development Department; Emily Halcon, Homeless Services Manager, (916) 808-7896, Office of the City Manager

**Presenter:** None

**Attachments:**
1-Description/Analysis
2-Resolution Declaring a Shelter Crisis

### Description/Analysis

**Issue Detail:** The crisis of unsheltered homelessness is one that impacts an entire community, both those experiencing homelessness and the broader community of housed residents, businesses, and neighborhoods. Over the past several years, the City has made significant investments to increase access to and availability of shelter, services and permanent housing for people and families experiencing homelessness. Despite these efforts, homelessness and its impacts continue to rise:

- From 2015 to 2017, the Sacramento region saw an 85% increase of unsheltered homelessness.
- According to the most recent Sacramento County Homeless Deaths Report, death rates among the unsheltered homeless population are four times that of the general population and rose by almost 75% from 2016 to 2017.
- Through the City's Railroad Drive Triage Shelter and the City's Pathways to Health + Home program, we are seeing the aging of the homeless population; over half of the participants in both programs are over the age of 50, and the majority self-identify one or more disabling conditions.
- In 2018, the City's 311 system fielded over 5,000 reports regarding homeless encampments, an increase of 33% from 2017.
- In 2018, the City's Police IMPACT team responded to over 4,800 calls for service related to homelessness.

In addition to the rise in homeless rates, Sacramento is experiencing a housing emergency. Residential rents are climbing, and many citizens face the threat of homelessness due to lack of access to affordable housing. Numerous other jurisdictions have declared a shelter crisis, including Los Angeles, San Jose, Oakland, San Francisco, and Berkeley, all of which identified homelessness as a first-priority issue.

While the City and County have made significant strides in adding capacity in the homeless crisis system, allocating funding for almost 300 new shelter beds for single adults and over 30 new shelter units (approximately 90 beds) for families, there is insufficient capacity to shelter everyone experiencing homelessness in Sacramento.

Homelessness encampments are increasing across the city within the public right of way, exposing individuals experiencing homelessness to traffic hazards, crime, risk of death and injury, lack of adequate sanitation and debris services, and other conditions that are detrimental to their health and safety. Evidence demonstrates that providing low barrier access to decent, safe, and stable housing and shelter combined with crucial support services in line

with "housing first" principles is the most effective and efficient way to help end homelessness, while respecting client choice and autonomy.[1]

In October, the City Council discussed a Five-Point Plan that would include 1) master leasing of scattered site rental units, 2) homeless overnight parking, 3) sleeping cabins/tents, 4) motel conversion, and 5) permanent supportive housing. Some of these options may involve construction of emergency facilities that may not fully meet building, health, housing, safety, and zoning codes and may include provision of shelter on private property in addition to publicly-owned or leased sites.

California Government Code Section 8698, et seq., allows the governing body of a city to declare a shelter crisis when a significant number of persons are without the ability to obtain shelter, resulting in a threat to their health and safety. In addition, California Government Code Section 8698.1 provides that, upon a declaration of a shelter crisis, the provisions of any state or local regulatory statute, regulation or resolution prescribing standards of housing, health, or safety, as applied to public facilities, shall be suspended to the extent that strict compliance would in any way prevent, hinder, or delay the mitigation of the effects of the shelter crisis. Lastly, California Government Code Section 8698.2 provides that, upon a declaration of a shelter crisis, a city may allow persons unable to obtain housing to occupy designated public facilities (including facilities leased by the city) during the duration of the crisis.

**Policy Considerations:** City Council made a short-term shelter crisis declaration on November 8, 2018 for the period between December 1, 2018 and March 1, 2019. On October 16, 2018, the Council held a workshop on Homeless Sheltering Policies and adopted a resolution embracing Housing First principles for City-funded Triage Shelters. At this meeting, the Council acknowledged the need for other shelter and service approaches, especially for vulnerable populations, including transition age youth and women and families. The recommended action will facilitate provision of these other shelter and service approaches over a longer (one-year) period, subject to review prior to the end of the period.

**Economic Impacts:**  No funds are being requested as a part of this report. However, the recommended declaration may help facilitate receipt of public and private funds to alleviate homelessness.

**Environmental Considerations:** This declaration is exempt from CEQA pursuant to CEQA Guidelines sections 15061(b)(3), in that it can be seen with certainty that no significant effect on the environmental would occur, and 15269(c) relating to specific actions necessary to prevent or mitigate an emergency.

---

[1] https://endhomelessness.org/what-housing-first-really-means/

**File ID:** 2019-01835

**Consent Item 12**

The City Council has reviewed and approved several shelter proposals, and has concluded, in each case, that the design, construction and operation of such shelters would have no significant effect on the environment. Design of the shelters includes consideration of health and safety concerns, security lighting, sanitation and noise. The community concerns regarding those experiencing homelessness include health, safety, security and sanitation, and the establishment of safe and secure environments has a beneficial environmental effect that has been recognized by the City.

**Sustainability:** Not applicable.

**Commission/Committee Action:** None.

**Rationale for Recommendation:** Homelessness is one of the biggest issues facing the City, and the City Council has made significant investments over the past years to increase services, shelter capacity and housing supports for people experiencing homelessness. Despite these efforts, homelessness is on the rise, and is affecting communities throughout the City and the County of Sacramento. Declaring a shelter crisis will enable the City to shelter people experiencing homelessness in designated public facilities and to suspend certain housing, health, and safety standards, the strict compliance with which may prevent, hinder, or delay using those facilities for shelter.

**Financial Considerations:** No funds are being requested as a part of this report. However, the recommended declaration may help facilitate receipt of public and private funds to alleviate homelessness.

**Local Business Enterprise (LBE):** Not applicable.

**RESOLUTION NO.**

Adopted by the Sacramento City Council

**DECLARING A SHELTER CRISIS IN THE CITY OF SACRAMENTO**

BACKGROUND

A.    At any point in time, approximately 2,800 persons within the city are experiencing unsheltered homelessness, according to the 2019 Sacramento County Point in Time Report. This population includes veterans, women, children, persons with disabilities, seniors, and other vulnerable groups. There is a significant threat to the health and safety of unsheltered persons in the number of people experiencing homelessness.

B.    Many of those unable to obtain shelter reside on the streets, in alleys and doorways, along the river, and in unauthorized encampments throughout the City.

C.    These individuals lack adequate sanitary facilities and are at risk from theft, crime, and extreme weather conditions. These conditions threaten the physical and mental health and safety of those experiencing homelessness. These conditions also result in a threat to the public health and well-being of the community.

D.    The City Council has heard extensive testimony on the impacts of homelessness on persons without shelter as well as on the community at large.

E.    Strict compliance with the provisions of state and local regulatory statutes, regulations, and ordinances prescribing standards of housing, health, safety, and environmental impact assessment may prevent, hinder, or delay the mitigation of the effects of the shelter crisis.

F.    The State Legislature has passed special legislation to facilitate provision of shelter in certain cities and counties that have declared a shelter crisis, but this legislation is not generally applicable to other cities and counties, including the City of Sacramento. At this time, this leaves available to the City of Sacramento the general state law on declaration of a shelter crisis under the California Government Code Title 2, Division 1, Chapter 7.8 including in particular sections 8698, 8698.1, and 8698.2

**BASED ON THE FACTS SET FORTH IN THE BACKGROUND, THE CITY COUNCIL RESOLVES AS FOLLOWS:**

Section 1.    A shelter crisis pursuant to California Government Code Title 2, Division 1, Chapter 7.8 including in particular sections 8698, 8698.1, and 8698.2 exists in the City of Sacramento. The effective period of the Shelter Crisis shall begin on January 14, 2020 and shall end on January 14, 2021.

Section 2.    The City Manager is directed to pursue legislation to assist the City in providing shelter to the homeless community, including application of Government Code section 8698.4 to Sacramento, additional CEQA exemptions, and alternative building standards for shelters on privately-owned sites.

Section 3.    The City Manager is directed to prepare alternative local standards and procedures for development and operation of homeless shelters if required.

Section 4.    The City Manager is directed to prepare an interim ordinance if required to streamline zoning regulations for privately-owned or operated shelters, including zoning administrator approval of conditional use permits for shelters, allowing small temporary shelters by right on sites with an approved assembly use, and streamlining approval of city-sponsored shelters on private property that may otherwise require zoning approvals.