1  SUSANA ALCALA WOOD, City Attorney (SBN 156366)
   **SEAN D. RICHMOND, Senior Deputy City Attorney (SBN 210138)**
2  srichmond@cityofsacramento.org
   CITY OF SACRAMENTO
3  915 I Street, Room 4010
   Sacramento, CA  95814-2608
4  Telephone:  (916) 808-5346
   Facsimile:   (916) 808-7455
5
   Attorneys for the CITY OF SACRAMENTO and SACRAMENTO POLICE
6  DEPARTMENT

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11

| | |
|---|---|
| PATRICK MAHONEY; CAROLINE KENNEDY; SURACHA XIONG; and BRANDON ALLEN, SR., on behalf of themselves and a class of similarly situated persons, | Case No.: 2:20-cv-00258-KJM-CKD |
| | **DEFENDANTS CITY OF SACRAMENTO AND THE SACRAMENTO POLICE DEPARTMENT'S OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER** |
| Plaintiffs, | |
| vs. | Date:        TBD<br>Time:        TBD<br>Location:    Robert T. Matsui US<br>            Courthouse<br>            501 I Street<br>            Sacramento, CA 95814 |
| CITY OF SACRAMENTO; SACRAMENTO POLICE DEPARTMENT; and DOES 1 to 50, | |
| | Courtroom:  TBD<br>Judge:      TBD |
| Defendants. | |

21                               **I**

22                        **INTRODUCTION**

23       Plaintiffs' position is that there should be unfettered permissibility to place unpermitted,

24  non-ADA compliant and uninsured property for an indeterminate amount of time on City-

25  owned land.  Should the Court grant Plaintiffs' application, the consequences, unintended or

26  not, would be ominous and would render many sections of the Sacramento City Code

27  regulating land use as null and void.

28  / / /

                                        1

It is undisputed that the parcel of land on which the port-a-potties at issue were placed is City-owned land. Sacramento City Code Section 12.12.020 states that it is unlawful for any person to encroach within public rights-of-way or other City property without first obtaining an encroachment permit from the City. It is further undisputed that neither the port-a-potty company (United Site Services), the private citizen(s) who caused them to be placed on City property, nor the campers using the toilets applied to the City for a permit for their placement.

In addition, Sacramento City Code Section 12.52.040 provides that it is unlawful and a public nuisance for any person to store personal property on any public property.

Not only did Plaintiffs fail to apply for a permit, they never attempted to meet and confer with any City representative regarding the placement of the port-a-potties prior to the filing of this lawsuit and application for TRO. In fact, when Plaintiffs' counsel first contacted the City Attorneys' office to notify it of the impending filing, counsel would not even offer a description of the location of the port-a-potties.

The complete lack of regulation on the placement of private property on City-owned property would leave the City of Sacramento exposed to unlimited liability and would severely restrict its ability to make use of and regulate its own land.

## II

## BACKGROUND

According to the instant application, an unknown citizen contracted with a port-a-potty company, believed to be United Site Services, to place two port-a-potties on land located adjacent to 522 North B Street. The toilets were abutted against a fence on land owned by the City of Sacramento and were initially placed on January 16, 2020. (Photographs taken of the toilets on February 5, 2020, are attached as Exhibit 1 to the Declaration of Sean D. Richmond). The toilets were observed by Sacramento Police not long after their placement.

As the toilets were unpermitted and located on City land, their placement was in violation of City Code Sections 12.12.020 and 12.52.040. Accordingly, on January 24, 2020, a member of the Sacramento Police Department contacted United Site Services and requested that the toilets be removed from their location. On or about January 25, 2020, the toilets were

2

1    removed.

2    Rather than seeking a permit for the toilets or contacting the City to determine if there

3    could be some type of conditional use resolution, a private citizen caused the toilets to be

4    placed back at the same location on February 3, 2020.

5    On the morning of February 4, 2020, Plaintiffs' counsel Mark Merin contacted the City

6    Attorney's Office and spoke to Beau Parkhurst, an attorney in the City Code Enforcement

7    Unit and informed him of the impending TRO application related to the placement of the port-

8    a-potties. (Declaration of Beau Parkhurst, ¶2).  Mr. Merin stated that he was required to

9    address the issue of alternative measures and told Mr. Parkhurst that he would accept nothing

10   less than the City's agreement to allow the toilets to remain where they are.  (Parkhurst Dec.

11   ¶3).  Mr. Parkhurst responded that he would need more information regarding the toilets, such

12   as their location and that he ultimately would not have the authority to bind the City to the

13   agreement demanded by Mr. Merin.  (Parkhurst Dec. ¶4).  Mr. Merin would not even agree

14   to disclose the location to Mr. Parkhurst claiming that if he did, the City would merely go to

15   the location and remove the toilets.  (Parkhurst Dec. ¶5).  Mr. Parkhurst advised Mr. Merin

16   that he would relay the information given to him to the supervisor of the City Attorney Office's

17   Litigation Section, Brett Witter.  (Parkhurst Dec. ¶6).

18   On February 4, 2020, at 12:43 p.m., Mr. Witter received an email from Paul Masuhara of

19   the Law Office of Mark Merin.  Attached to Mr. Masuhara's email were copies of the

20   Summons and Complaint in this matter, along with a motion for Temporary Restraining

21   Order.  The motion for TRO specifically indicated that there was no hearing yet scheduled.

22   The email also indicated that Mr. Merin had called the City Attorney's Office "multiple times

23   and left messages," but that he had been unsuccessful in reaching Mr. Witter regarding the

24   attached documents (Declaration of Brett Witter, ¶2).  Mr. Witter has not yet spoken with Mr.

25   Merin or Mr. Masuhara about this matter.  In addition, Mr. Witter reviewed all of his received

26   voicemail messages and determined that he had not received any from Mr. Merin or Mr.

27   Masuhara regarding this matter. (Witter Dec., ¶3.)  Later, at 3:22 p.m., Mr. Witter received

28   another email from Paul Masuhara of the Law Office of Mark Merin providing him with a

1  copy of Judge Kimberly J. Mueller's February 4, 2020, minute order requiring the City to file

2  any opposition to the TRO application by 5:00 p.m. on February 5, 2020.  (Witter Dec., ¶ 4).

3  Mr. Witter is informed and believes that Mr. Masuhara served a copy of Judge Mueller's

4  February 4, 2020 minute order on the City Clerk at 4:45 p.m. on February 4, 2020.  (Witter

5  Dec., ¶5).

6  ## III

7  ## RELEVANT SACRAMENTO CITY CODE ("SCC") SECTIONS

8  ## AND PERMITTING PROCESS

9  SCC section 12.12.020 states that it is unlawful for any person to encroach within public

10  rights-of-way or other city property without first obtaining an encroachment permit from the

11  City.  (See Declaration of Jennifer Johnson, ¶2).  SCC section 12.12.030 specifically identifies

12  the requirements for the application for permit.  (Johnson Dec., ¶3).  SCC section 12.12.040

13  identifies the conditions by which a permit will be issued, which includes a statement of the

14  anticipated duration of the permit. (Johnson Dec., ¶4).  SCC section 12.12.050 requires that

15  the permittee comply with all current federal, state and local safety regulations and all federal

16  and state disability laws including those requiring an accessible path of travel. (Johnson Dec.

17  ¶5).  SCC section 12.12.100 states that a condition for the issuance of the permit is that the

18  permittee shall hold harmless and indemnify the City from any liability arising from the

19  issuance of the permit. (Johnson Dec. ¶6).  SCC section 12.12.110 requires that the permittee

20  acquire insurance against any liability arising from the use of the permit. (Johnson Dec. ¶7).

21  Finally, SCC section 12.52.040 states that it is unlawful and a public nuisance for any person

22  to store personal property on any public property.

23  The process for obtaining an encroachment permit is that the applicant submit the

24  encroachment permit application and the revocable permit application.  The Department of

25  Public Works would process both applications concurrently.  The revocable permit application

26  requires clearance letters to be signed off by any entity who has rights to the area in question.

27  For example, if the object to be placed in the right-of-way is to be located near a SMUD pole

28  or tree, both SMUD and the City's division of Urban Forestry would need to sign off on a

clearance letter.  Once all the approvals are in place on both applications, the department of Public Works would then submit the application for final processing.  The revocable permit would require the applicant to agree to the terms of the permit which includes (among other provisions) providing maintenance of the improvement, carrying liability insurance, and removing the improvement within 5 days if the city revokes the permit.  The entire list of provisions is listed in City resolution 81-845 which is also included as part of the application package. (Johnson Dec., ¶ 8).

## IV

## ANALYSIS

### A.   General Law and Procedure Regarding Temporary Restraining Orders

The purpose of a temporary restraining order is to preserve the status quo pending the complete briefing and thorough consideration contemplated by full proceedings pursuant to a preliminary injunction.  *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 438-39 (1974) (temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."  See also *Reno Air Racing Ass'n. Inc. v. McCord*, 452 F. 3d 1126, 1131 (9th Cir. 2006); *Dunn v. Cate*, 2010 WL 1558562 at *1 (E.D. Cal. 2010).

Issuance of a temporary restraining order, as a form of preliminary injunctive relief, is an extraordinary remedy and Plaintiffs have the burden of proving the propriety of such a remedy. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

In order to establish the propriety of a TRO, the moving party must establish: (1) That he is likely to succeed on the merits of the underlying complaint; (2) That he is likely to suffer irreparable harm in the absence of the preliminary relief; that the balance of equities tips in his favor; and (3) That an injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

### B.   Plaintiffs Are Unlikely to Succeed on the Merits as the Matter Lacks Ripeness and Plaintiffs Lack Standing

Plaintiffs seeking a temporary restraining order is presently premature.  The ripeness

1  doctrine protects the court from engaging in speculation or wasting resources through review

2  of potential or abstract disputes. *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589

3  (11th Cir. 1997). In applying the ripeness doctrine, the court evaluates two components: (1) a

4  constitutional component and (2) a prudential component. *Thomas v. Anchorage Equal Rights*

5  *Com'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).

6  **(1)    Constitutional Component**

7  The constitutional component mandates that prior to the court's exercise of jurisdiction,

8  the issues presented are definite and concrete – not hypothetical or abstract. *Id*. at 1139.  In

9  support for a temporary restraining order against the City, Plaintiffs assert abstract concepts

10  of: (1) right to privacy; (2) right to bodily integrity; (3) state-created danger; and (4) punishment

11  for involuntary conduct. Motion for TRO, 4:1-8:15. However, Plaintiffs do not address the

12  applicable ordinance at hand which is Sacramento City Code Section 12.12.020

13  ("Encroachment permit required – Except emergencies").

14  As set forth in Sacramento City Code section 12.12.020:

15  "It is unlawful for any person to encroach within public rights-of-way or other city

16  property without first obtaining an encroachment permit from the director and to

17  comply with the requirements of the permit.

18  Nothing in this chapter shall be construed to prevent any person maintaining any

19  utility facilities in or under any right-of-way by virtue of any law, ordinance or

20  permit, from encroaching in the public right-of-way as may be necessary for the

21  preservation of life or property when the necessity arises, provided that the person

22  shall notify the director within one day after the offices of the city are first opened

23  subsequent to the encroachment. Except as specifically provided otherwise in this

24  chapter, encroachments authorized by this section shall be subject to all fees and

25  requirements of this chapter."

26  Pursuant to Sacramento City Code 12.12.020, an encroachment permit is required prior

27  to encroaching within the public right-of-way. In Plaintiffs' motion for TRO, there is no

28  mention that the individual(s) who obtained/rented the port-a-potty first applied for an

6

1    encroachment permit. Further, there is no record that said individual(s) gave any notice to the

2    City prior to the placement of the port-a-potty on February 3, 2020. Motion for TRO, 2:17.

3        Furthermore, both the Supreme Court and this circuit have declared that until a

4    landowner seeks a permit or a variance under a governing land use or zoning ordinance, any

5    claim that the ordinance is unconstitutional as applied to the landowner's property is not ripe

6    for judicial adjudication. *Shelter Creek Development Corp. v. City of Oxnard* 838 F.2d 375, 377

7    (9th Cir. 1988). In *Shelter Creek*, Plaintiff were owners of an apartment complex who planned

8    to convert the complex into stock cooperatives. They challenged the constitutionality of

9    defendant City of Oxnard's recently enacted zoning ordinance that required the owners to

10   comply with certain building and parking restrictions. *Id*. at 375-.76. The plaintiffs did not

11   apply for a special use permit or seek a variance, but, instead, sued Oxnard under 42 U.S.C. §

12   1983. *Id*. The *Shelter Creek* court applied the ripeness doctrine and found that Plaintiffs failed

13   the prerequisite step of having first applied for a permit or a variance. *Id*. 379-380. The court

14   also rejected Plaintiffs' contention that their 1983 cause of action excused them from this

15   procedural requirement. *Id*. at 378.

16       Likewise here, Plaintiffs have failed to establish that any application for an encroachment

17   permit has been submitted to the City to allow for a port-a-potty on the public right-of-way.

18   Accordingly, Plaintiffs cannot satisfy the constitutional component for ripeness.

19       **(2)    Prudential Component**

20       The prudential component requires the court to evaluate the fitness of issues for judicial

21   decision and the hardship to the parties of withholding court consideration. *Thomas v.*

22   *Anchorage Equal Rights Com'n*, 220 F.3d at 1141. Justiciability concerns not only the standing

23   of litigants to assert particular claims, but also the appropriate timing of judicial intervention.

24   *Renne v. Geary*, 501 U.S. 312, 320 (1991).

25       Here, Plaintiffs do not have the requisite standing. Plaintiffs are not the one(s) who

26   obtained and ordered the placement of the port-a-potty on the public right-of-way. Moreover,

27   Plaintiffs have not made any attempt to have first sought an encroachment permit before

28   proceeding with the placement of the port-a-potty.

7

1   Likewise, with respect to hardship, Plaintiffs fail to establish any real or imminent threat
2   of enforcement as related to them. In *Renne v. Geary*, Plaintiffs were members of a political
3   party central committee that sought to challenge a state constitutional provision that prohibited
4   committee endorsement of candidates for public office. *Renne v. Geary*, 501 U.S. 312. One issue
5   for the court to determine was whether the committee could have third-party standing to assert
6   the rights of candidates. *Id.* at 320. The court questioned whether the committee had standing
7   since there was no barrier that would prevent a candidate from asserting his or her own rights.
8   *Id.* The *Renne v. Geary* court ultimately held no ripe controversy could be found as enforcement
9   action had not been taken. *Id.* at 321-22.

10   Plaintiffs fail to set forth any facts or admissible evidence that any enforcement action has
11   been taken against the individual(s) who obtained and placed the port-a-potty onto the City's
12   public right-of-way. Further, plaintiffs fail to establish that any criminal action has been taken
13   against the individual(s) who placed port-a-potty onto the City's public right-of-way.

14   For such reasons, this court should deny plaintiffs' TRO. See *Guatay Christian Fellowship*
15   *v. County of San Diego*, 670 F.3d 957 (9th Cir. 2011) (Ninth Circuit affirmed district court's
16   determination that church's constitutional and statutory claims were not ripe for review
17   because the church had failed to apply for the required land use permits).

18   **C.   Enforcement of the City Code is the Status Quo**

19   A TRO's purpose is to preserve the status quo pending complete briefing by the parties
20   and full proceedings. See *Dunn*, 2010 WL 1558562 at *1. Here, the status quo is that the SCC
21   sections requiring permitting for encroachments on City-owned property have been in effect
22   for decades and most recently amended to their present form in 2009. The unlawful placement
23   of the toilets at their present location began approximately three weeks ago on January 16,
24   2020.   Plaintiffs make no allegation that the City had not been enforcing the permitting
25   ordinances prior to January 16, 2020.     Thus, the status quo is that there are currently
26   ordinances that have been enforced for decades.

27   Accordingly, Plaintiffs' application for TRO does not seek to maintain the status quo,
28   rather it seeks to alter the status quo: if granted, the City would be precluded from enforcing

8

1 | SCC sections 12.12.020, *et seq.*  Contrary to the terms of those ordinances, Plaintiffs would
2 | then be able to place portable toilets, without permit, on any City-owned property.  This would
3 | be a material change of position from the status quo which clearly necessitates the denial of a
4 | TRO.

5 | **D.  The Constitutionality of the City's Permitting Ordinances is Not Being Challenged**

6 | Plaintiff's application identifies broad guarantees provided by the United States Constitution
7 | that would allegedly be breached if the TRO is not granted.  Identification of these rights is
8 | really all that is being offered by Plaintiffs.  Following the identification of each of these rights,
9 | Plaintiffs repeat a rote claim that many of the users of the toilets are disabled and would be
10 | without access to restroom facilities if the toilets were removed.  These assertions do not rise
11 | to the level of the burden required to demonstrate that Plaintiffs would succeed on the merits.

12 | Moreover, Plaintiffs make no constitutional challenge to the City's permitting process and
13 | ordinances.  Plaintiffs' silence on this issue again dovetails into the issue of ripeness.  Plaintiffs
14 | have done nothing to adhere to or challenge the City's permitting requirement.  Unless and
15 | until they do, it cannot be said that anyone's constitutional rights are being violated.

16 | As to the specific claim that Plaintiffs are being punished for involuntary conduct in
17 | violation of the Eighth Amendment, it must be noted that neither the benefactors of the toilets
18 | nor the users of the toilets have, or will be, criminally prosecuted.  The toilets were simply
19 | removed because they were unlawfully placed at their location.  Thus, Plaintiffs' reliance on
20 | *Martin v. City of Boise* and its' progeny is misplaced.

21 | Similarly, Plaintiffs' Due Process claims pursuant to the Fourteenth Amendment also fail.
22 | There is no evidence that the City's permitting requirements were enacted with deliberate
23 | indifference or a purpose to harm.  *A.D. v. Cal. Highway Patrol*, 712 F. 3d 446, 453 (9th Cir.
24 | 2013).  Rather, they simply provide a regulatory framework for the placement of
25 | encroachments on City-owned land.

26 | / / /

27 | / / /

28 |

9

**E.   The City Will Be Exposed to Unlimited Potential Liability Should the Unpermitted Toilets Be Allowed to Remain at Their Present Location**

As stated above, there are conditions on the issuance of encroachment permits.  Said conditions include, but are not limited to, that liability insurance for the encroachment must be procured and that the encroachment must be compliant with the Americans With Disabilities Act.

Coincidentally, there is pending litigation in this very courtroom regarding the exact issue of non-ADA compliant portable toilets on City-owned property.  The case is *Pina v. City of Sacramento*, Eastern District Case number 2:20-cv.00106-KJM-EFB.  In this matter Plaintiffs allege ADA violations against the City of Sacramento for (among other things) an inaccessible portable toilet.  In *Pina*, the Plaintiffs were at City-owned Miller Park on two occasions, first for a "Rhythm and Blues Festival" and on a second occasion for a "Seafood Festival," both of which were sponsored by third parties, and held pursuant to special event permits with the City's Parks Department.  While the sponsoring entities arranged for placement of the portable toilets on both occasions, the City is a defendant in the action.

In Plaintiff's application herein, it is alleged that many of the users of the toilets are disabled.  If that is true, there are ongoing and active violations of the ADA causing exposure of liability to the City as the subject toilets are not incompliance with the ADA.  If Plaintiffs' TRO is granted in this matter and the City is then faced with the prospect of unpermitted toilets being placed throughout the City, the City's consequential legal liability would be staggering.

**F.   Plaintiffs Have Not Demonstrated They Will Suffer from Irreparable Harm**

Because Plaintiffs have failed to establish that they adhered to the City's permitting ordinances, much less made any demonstration that the ordinances are unconstitutional, they cannot show that they will suffer irreparable injury from the continued application and enforcement of the ordinances.

**G.   Balance of Equities and Public Interest**

Because Plaintiffs have not met their burden to demonstrate that they are likely to succeed that the City's removal of the toilets is unconstitutional, they cannot show that the balance of

10

1 | equities or public interest favor the granting of a TRO to allow the toilets to remain at their
2 | present location.

V

## CONCLUSION

Based on all of the foregoing, Defendants respectfully maintain that the Plaintiffs' motion does not support the drastic remedy of a temporary restraining order. In the most basic terms, in order to place an encroachment on City-owned property, one must go through the process of procuring a permit. That was never done by Plaintiffs, nor the private citizen(s) who caused the toilets to be placed at their location, nor by United Site Services who provided the toilets. As the permits were never applied for and no challenge has been made to the constitutionality of the City's permitting ordinances, there is no present justiciable controversy before the Court and the matter therefore lacks ripeness.

To the extent that Plaintiffs may have been unaware of the City's permitting requirements, they could have merely inquired prior to immediately filing a lawsuit and seeking injunctive relief thus wasting the time and resources of both the parties and the Court.

The City must be able to regulate the use of its property. It has been doing so for decades and as such, the existing regulatory ordinances are the status quo. Granting the TRO and allowing citizens to place personal property wherever they please would create chaos insofar as the City's ability to regulate land use. For these reasons, Defendants City of Sacramento and the Sacramento Police Department respectfully request that Plaintiffs' application for a TRO be denied.

DATED: February 5, 2020          SUSANA ALCALA WOOD,
City Attorney

By:   /s/ SEAN D. RICHMOND
**SEAN D. RICHMOND**
Senior Deputy City Attorney

Attorneys for the CITY OF SACRAMENTO
and the SACRAMENTO POLICE
DEPARTMENT

11